**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
--------------------------------------------------------------------X

MAYA BEN-AVNER PHIPPS,
Individually and as Trustee of the
PHIPPS FAMILY TRUST and the
J AND M FAMILY TRUST,

Plaintiff,

-vs-

JEROME JOHNSON PHIPPS JR. a/k/a JAKE PHIPPS
a/k/a JEROME PHIPPS, MARGERY PHIPPS,
MARIA EVANS A/K/A THERESA EVANS,
COHEN, LABARBERA & LANDRIGAN, LLP,
RONALD J. COHEN, WEBSTER BANK, N.A., and
HOWARD GREEN,

Defendants.

--------------------------------------------------------------------X

**AMENDED**
**SUMMONS**

Index No.: 156806/2025
Date Index No. Purchased:
May 29, 2025

TO THE ABOVE-NAMED DEFENDANTS:

**PLEASE TAKE NOTICE THAT YOU ARE HEREBY SUMMONED** and

required to serve upon Plaintiff an answer to the complaint in this action within twenty

days after the service of this summons, exclusive of the day of service, or within thirty

days after service is complete if this summons is not personally delivered to you within

the State of New York.

**YOU ARE FURTHER NOTIFIED** should you fail to answer a judgment will be

entered against you by default for the relief demanded in the complaint.

Dated: Fresh Meadows, New York
      January 28, 2026

/Jonathan Neuman/
JONATHAN NEUMAN
*Attorney for Plaintiff*
176-25 Union Turnpike, Suite 230
Fresh Meadows, New York 11366
(347) 450-6710
(718) 228-3689 *facsimile*
jnesq@jenesqlaw.com

**Defendants' Addresses:**
JEROME JOHNSON PHIPPS JR. a/k/a JAKE PHIPPS

Case 1:26-cv-01089-LAK     Document 1-1     Filed 02/09/26     Page 2 of 41

a/k/a JEROME PHIPPS
710 Claremore Drive, West Palm Beach, FL 33401

MARGERY PHIPPS
4903 Tamaron Drive, Greensboro, NC 27410

MARIA EVANS A/K/A THERESA EVANS
710 Claremore Drive, West Palm Beach, FL 33401

COHEN, LABARBERA & LANDRIGAN, LLP
40 Matthews Street, Suite 203, Goshen, NY 10924

RONALD J. COHEN
c/o COHEN, LABARBERA & LANDRIGAN, LLP
40 Matthews Street, Suite 203, Goshen, NY 10924

WEBSTER BANK, N.A.
360 Lexington Ave, 5th Floor, New York, NY 10017

HOWARD GREEN
c/o WEBSTER BANK, N.A.
360 Lexington Ave, 5th Floor, New York, NY 10017

**VENUE:**       Plaintiff designates New York County as the place of trial. The basis of
the venue designated is the address of Plaintiff: 341 East 62nd Street, New York, NY
10065.

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 3 of 41

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

-----------------------------------------------------------------------X

MAYA BEN-AVNER PHIPPS,
Individually and as Trustee of the
PHIPPS FAMILY TRUST and the
J AND M FAMILY TRUST,

                      Plaintiff,

          -vs-

JEROME JOHNSON PHIPPS JR. a/k/a JAKE PHIPPS
a/k/a JEROME PHIPPS, MARGERY PHIPPS,
MARIA EVANS A/K/A THERESA EVANS,
COHEN, LABARBERA & LANDRIGAN, LLP,
RONALD J. COHEN, WEBSTER BANK, N.A., and
HOWARD GREEN,

                      Defendants,

-----------------------------------------------------------------------X

**AMENDED**
**VERIFIED**
**COMPLAINT**

Index No. 156806/2025

**JURY TRIAL DEMANDED**

      Plaintiff, MAYA BEN-AVNER PHIPPS, by her attorney, JONATHAN E. NEUMAN, ESQ., as and for her Verified Complaint, alleges as follows:

    1.  Plaintiff MAYA BEN-AVNER PHIPPS ("MAYA") is an individual with an address in West Palm Beach, Florida.

    2.  Defendant JEROME JOHNSON PHIPPS JR. a/k/a JAKE PHIPPS a/k/a JEROME PHIPPS ("JEROME") is an individual with an address in West Palm Beach, Florida.

    3.  Defendant MARGERY PHIPPS is an individual with an address in Greensboro, North Carolina.

    4.  Defendant MARIA EVANS A/K/A THERESA EVANS is an individual with an address in West Palm Beach, Florida.

    5.  Defendant COHEN, LABARBERA & LANDRIGAN, LLP ("COHEN LLP") is a domestic limited liability partnership with an address at 40 Matthews Street, Suite 203, Goshen, NY 10924.

6.   Defendant RONALD J. COHEN ("COHEN") is a principal of Defendant COHEN, LABARBERA & LANDRIGAN, LLP.

7.   Defendant WEBSTER BANK, N.A. ("WEBSTER") is a national banking association with headquarters in Stamford, CT.

8.   Defendant HOWARD GREEN ("GREEN") is a banker and relationship manager at Defendant WEBSTER, who was stationed at WEBSTER's Manhattan branch at 360 Lexington Ave, 5th Floor, New York, NY 10017.


**FACTUAL BACKGROUND**

9.   This case involves financial mismanagement, fraudulent transfers, concealed assets, and corporate & bank fraud orchestrated by defendant JEROME with the assistance of the other defendants.

10. MAYA and JEROME became business partners in or about 2001.

11. They initially operated out of New York City, successfully operating a marketing, PR, and events company called First Contact World Wide in NYC with clients ranging from hospitality venues like Avalon Night Club to product launches for companies like DKNY, from 2001–2003.

12. On or about January 2003, the two moved to China because of MAYA's family who had been doing business with China for over 30 years.

13. There the two created a company called Buy China Direct and another called China Direct Limited, which involved turnkey custom manufacturing and supply chain of building materials and interior finishes, servicing everything from low-income housing for developers like Amnon Shalhov, to high end finishes direct from China to clients like

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 5 of 41

Related Group / Steve Ross, for Hudson Yards, Virgin Hotel, Marriott, Ludlow, Marlton Hotel, and many others.

14. The company soon grew into a global operation, with offices in New York and China, and employees in Italy, Belarus, Chile, and other countries.

15. Eight years after beginning their business venture together, MAYA and JEROME married in or about January 2009.

16. After marriage, the two maintained their business relationship, and they opened two new companies, BCD Consultants LLC d/b/a Phipps and Co., as well as Phipps Construction to do the installation and build out of the building materials they were supplying.

17. MAYA and JEROME thereafter met Defendant COHEN and his firm, Defendant COHEN LLP, in or about 2012 after the passing of MAYA's father.

18. In or about February 2013, the Phipps Family Trust was established, with both MAYA and JEROME being named as trustees.

19. The Trust had an address at 341 East 62nd Street, New York, NY 10065, which is where MAYA and JEROME were living at the time.

20. The Trust also designated MAYA's aunt, Reba Dickstein, as Successor Trustee, and included a Trust Protector provision.

21. The Trust also allowed either trustee to act individually as to all powers granted to the trustees.

22. The trust was set up by Defendant COHEN as a bearer bond trust.

23. Although it was a bearer bond trust, the Memorandum of Trust named JEROME and MAYA's children as the intended beneficiaries.

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 6 of 41

24. Under the trust document, any disputes relating to the trust have to be litigated under New York law.

25. Defendant COHEN and his firm, Defendant COHEN LLP, were attorneys for both MAYA and JEROME, as well as their entities and trust.

26. Defendant COHEN and his firm handled everything for MAYA and JEROME, from opening new corporations to setting up their Phipps Family Trust, to drafting their wills, to representing them in a real estate purchase in 2015, to handling sales tax issues that JEROME got the company into.

27. In 2015, COHEN and his firm helped MAYA and JEROME purchase a property in Sag Harbor, New York (28 Windermere Drive), using funds that MAYA inherited from her father.

28. In November 2016, COHEN and his firm helped MAYA and JEROME transfer the Sag Harbor property into the Trust, with both MAYA and JEROME retaining life estates.

29. MAYA agreed to the transfer because she believed that it would be in the best interest for this core asset, which had been purchased with money she inherited from her father, to be in this Trust for the benefit of her children.

30. MAYA was told by JEROME and COHEN that the trust assets were supposed to grow to include:

    a.   MAYA and JEROME's Sag Harbor home (~$2.9M value);

    b.   4 life insurance policies ($2M each for JEROME and MAYA);

    c.   College funds for the children;

    d.   MAYA and JEROME's businesses, including BCD Consultants LLC

           d/b/a Phipps & Co. and Phipps Construction; and

    e.   Any other real estate acquired or companies opened by MAYA and

           JEROME.

31. However, MAYA had come to learn that contrary to what she was told by

JEROME and COHEN, few assets were put into the Trust, as upon information and

belief, only the Sag Harbor home and BCD Consultants LLC were put into the Trust.

32. Originally, MAYA was 51% owner of BCD Consultants LLC d/b/a Phipps & Co.,

although as stated, it was moved into the Trust, thereby making the Trust the owner.

33. MAYA has additionally recently discovered that not only were their other assets

not put into the Trust, but JEROME, with the substantial assistance of the other

Defendants, has embezzled and defrauded the trusts and the companies in which MAYA

is or was supposed to be owner, as well as diverting away millions of dollars in new

orders to companies wholly-owned by JEROME.

34. In June 2020, JEROME and COHEN created the J & M Phipps Family Trust.

35. MAYA was told that this trust would mirror the Phipps Family Trust.

36. However, she was not provided any documents by JEROME or COHEN.

37. In fact, this Trust did not mirror the Phipps Family Trust, as instead of making

their children the beneficiaries as under the Phipps Family Trust, instead made JEROME

and MAYA the beneficiaries.

38. Moreover, upon information and belief, COHEN created two different versions of

the trust documents, one that he showed MAYA and then one that was actually executed.

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 8 of 41

39. At around the same time JEROME and COHEN also created Phipps Enterprises, LLC d/b/a Phipps International.

40. MAYA was told by both JEROME and COHEN that she was 50% owner of the entity because the owner would be the J&M Family Trust, and that the entity would be used to manage the USA business from MAYA and JEROME's companies, BCD Consultants LLC d/b/a Phipps & Co. and Phipps Construction, and expand their operations to raising capital for developments, consulting in foreign affairs, and other business ventures.

41. However, MAYA has recently found a document showing JEROME as the sole member.

42. Again, upon information and belief, COHEN drafted two different versions of the operating documents, one that MAYA was shown and then one that was actually executed.

43. Moreover, although Defendant COHEN formed the LLC with both MAYA and JEROME as co-managers, just two and a half months later, Defendant COHEN drafted a First Amended and Restated Operating Agreement for Phipps Enterprises, LLC naming JEROME as the sole manager, thereby effectively giving JEROME control of the company, its decision-making, and all its financials, leaving MAYA with no say whatsoever.

44. Since the filing of this lawsuit, JEROME has apparently filed a document with the Florida Division of Corporations now changing it back to the J & M Phipps Family Trust as the sole member of Phipps Enterprises, LLC.

45. Upon information and belief, COHEN additionally assisted JEROME in creating dozens of additional entities, including: Uphill Capital Ventures LLC, Phipps Global LLC, Phipps Construction, Graham & Phipps, Matrix Investment Trust, Moonkite Media, J And M Family Trust, Hemp Solution, Suncroft Advisors, Sa Sb Myrtle Beach, Phipps Sc LLC, Prefabit, Concept Global, Uzbek National Resources, Monarch, Quadmedia, Treanor and Phipps, Natural Resources Of Central Asia, Capital Networks Systems, and Yada Media.

46. MAYA was either not informed of these entities, or was informed about them but was lied to about the circumstances.

47. For example, MAYA was told about Graham & Phipps but was told that it was closed, when in fact it was opened with an account with several hundreds of thousands of dollars as of 2024.

48. Similarly with Suncroft Advisors and Phipps SC, MAYA had been made aware of the entities but not their activity because JEROME had left MAYA off the paperwork; upon information and belief, JEROME funded the entities using MAYA's inheritance money and other Phipps entity cash, and then proceeded to lose well over $400,000.

49. MAYA was also later told by JEROME and by COHEN that a number of these entities were transferred to the J & M Family Trust.

50. MAYA has also recently learned that COHEN filed false filings in Florida relating to Phipps Enterprises.

51. Upon information and belief, COHEN is not a Florida licensed attorney.

52. Notwithstanding this, COHEN fraudulently filed several filings on behalf on behalf of Phipps Enterprises on the Florida government website Sunbiz, listing himself as attorney and his location as "99 Brookside Avenue, Chester, Florida".

53. However, there is no such location; rather COHEN's office is at 99 Brookside Avenue, Chester, New York.

54. In 2023, shortly before JEROME filed for divorce from MAYA, COHEN filed an annual report listing JEROME as the only member of Phipps Enterprises, LLC.

55. This prohibited MAYA from accessing the bank accounts once JEROME moved the accounts, as discussed further herein.

56. Additionally, JEROME and COHEN listed an Amrit Kharas as the "Controller" of the entity.

57. When Ms. Kharas was contacted, however, she denied ever being the "Controller" of Phipps Enterprises or authorizing her name to be listed on the Florida filings, a further confirmation that JEROME and COHEN knowingly submitted false and unauthorized information on public legal records.

58. MAYA has also learned that in September 2020, JEROME and COHEN established a new secret trust, named the Matrix Trust, which named JEROME as sole trustee and beneficiary.

59. At that same time, COHEN helped JEROME form Uphill Capital Ventures, LLC, which was funded using trust assets that really belonged to MAYA.

60. In May 2021, COHEN then helped JEROME form a new entity, Matrix Ventures LLC.

61. This was all done without MAYA's knowledge or consent.

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 11 of 41

62. JEROME then used this trust and these entities to funnel assets belonging to MAYA from the various entities, including Phipps Enterprises, Phipps Construction, BCD Consultants d/b/a Phipps & Co., into Matrix Trust and other hidden accounts like Moonkite Media, Phipps Global, EV Plus, etc.

63. Defendant COHEN and his firm were excluding MAYA from all corporate understanding and access while creating debt in her name and creating new entities on JEROME's behalf.

64. None of this was disclosed to MAYA by COHEN or JEROME, even though these entities were being created and moved around with her money, and all while MAYA was being told by JEROME and COHEN that they were protecting her joint partnership and family assets.

65. As some specific examples of JEROME's transfers, MAYA has learned that:

   a. $290,000 was transferred from their joint account into a Phipps Enterprises account that was solely under JEROME's control;

   b. $160,000 was moved from Phipps Enterprises into UpHill Capital, a company under Matrix Trust, which is solely controlled by JEROME;

   c. $100,000 was wired from MAYA and JEROME's account at Flagstar Bank to an unknown account;

   d. $190,000 was sent by JEROME from Phipps Enterprises to EV Plus Corp;

66. MAYA learned about this from the bank at which she and JEROME maintained accounts.

67. Originally, MAYA and JEROME had their accounts at Signature Bank (signature was recently taken over by the FDIC and most of its accounts and assets transferred to Flagstar Bank) for nearly two decades.

68. Their personal, business, and trust and estate banker during this time was Defendant GREEN.

69. In October 2023, GREEN was still working at Flagstar Bank and was the banker over JEROME and MAYA's accounts.

70. When MAYA called GREEN about what was happening with the impending divorce, GREEN said that he was very sorry for everything that had happened, that he was disappointed with JEROME, and that he had instructed JEROME to move all of their accounts to another bank because GREEN could no longer represent their accounts.

71. In December 2024 as MAYA learned more about JEROME's various activities complained of herein, she contacted Flagstar to try to uncover the location of her funds, and was surprised to learn that GREEN was no longer there.

72. Instead, she spoke with a Noel Vasquez, the new personal business banker, who informed her that $290,000 had been transferred to the Phipps Enterprises account and that all of their accounts had been moved to Webster Bank with Defendant GREEN.

73. This was when MAYA learned that GREEN had lied to her, and that without her knowledge, shortly before and after JEROME filed for divorce from MAYA, in or about 2023/2024 GREEN moved to Defendant Webster and facilitated the transfer of MAYA and JEROME's various accounts on JEROME's behalf into accounts controlled by JEROME.

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 13 of 41

74. He did this using operating agreement and trust documents created by JEROME and COHEN which listed JEROME as the sole owner of various entities.

75. Notwithstanding GREEN's knowledge of the various trusts and that MAYA was an owner of the businesses, his having been her banker for 19 years, and his knowledge of the divorce that was then taking place, GREEN assisted JEROME in transferring all of the assets into accounts that were controlled solely by JEROME.

76. GREEN never notified MAYA that the accounts were being transferred to another bank or into accounts controlled by JEROME.

77. Upon information and belief, there was at least $1.8 million deposited into the Phipps Enterprises account at WEBSTER.

78. Vasquez did inform MAYA that there was one Phipps Enterprises account still at Flagstar, however he stated that it was under a new account number under JEROME'S control with paperwork showing that only JEROME could manage and control it.

79. Because of that, even though Flagstar Bank had had the trust documents and operating agreements showing MAYA's 50% ownership, Flagstar Bank stopped all communication with her.

80. When MAYA learned about the transfer and contacted GREEN at Webster and sent him documents proving that she was still the owner of Phipps Enterprises and requesting immediate access and statements, GREEN then assisted JEROME in moving the funds out of Webster Bank, thereby enabling JEROME to again embezzle the funds.

81. MAYA has also recently learned that since February 2022, JEROME has illicitly diverted VRBO insurance and rental income generated by the Sag Harbor property, an asset held in the Phipps Family Trust, into a non-trust account held under the Matrix

INDEX NO. 156806/2025
RECEIVED NYSCEF: 02/04/2026

Trust, where he is the sole trustee and sole beneficiary. As Trustee of the Phipps Family

Trust, MAYA was improperly excluded from access to the VRBO account and denied

proceeds. It is believed that over $150,000 was converted and diverted by JEROME.

82. To accomplish this, JEROME acted in concert with a woman named Marie Evans,

who goes by the alias Theresa Evans, who manipulated the booking system by blocking

off dates to prevent the home from being rented, directly interfering with trust revenue.

83. Ms. Evans also informed the house manager, Edd Konak, that the property would

be going into a short sale as of June 2024—despite no such authorization from MAYA,

the Trustee.

84. In furtherance of this scheme, Ms. Evans also engaged Susan Lahrman, a licensed

broker with Douglas Elliman, to remove furniture from the Sag Harbor home. This action

was taken without any notice or permission from MAYA, and was intended to prepare

the property for an unauthorized sale in violation of trust authority and property control.

85. Additionally, between 2018 and 2019, JEROME allowed an unpaid sales tax debt

to accumulate against BCD Consultants d/b/a Phipps & Co.

86. At the time, in 2020, JEROME informed MAYA about the debt, and told her that

it had grown to $550,000 and that the company was under audit.

87. In fact, however, MAYA has uncovered documents showing that the debt was

only a little over $100,000.

88. She had never been informed of this by either JEROME or COHEN, nor was she

ever given an explanation of how it had grown from ~$100,000 to ~$550,000.

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 15 of 41

89. In 2021 and 2022, COHEN coordinated a plan to pay the tax debt using income from the Legacy Towers condo project, a fee that MAYA and JEROME were set to earn for raising capital for a project.

90. COHEN recommended disguising the income as a "loan" to avoid tax imputation and defer responsibility.

91. In or about late 2021 or early 2022, COHEN and COHEN LLP were given $820,000 from the Legacy Towers condo project to pay this accrued sales tax debt.

92. MAYA was led to believe by COHEN and COHEN LLP that they would use this money to resolve the debt.

93. However, MAYA has recently learned that COHEN and COHEN LLP never paid the debt, which has now grown to, upon information and belief, nearly $3.5 million with interest and penalties.

94. This has resulted in a lien being placed against the PHIPPS FAMILY TRUST's Sag Harbor house due to JEROME's false listing of the property as the company's address.

95. Upon information and belief, instead of paying the tax debt, COHEN and COHEN LLP made transfers of hundreds of thousands of dollars to JEROME's companies at JEROME's instruction, contrary to their duty to MAYA.

96. As a result of documents that were turned over by JEROME in their recent divorce case (which was dismissed for JEROME's failure to prosecute), MAYA has recently discovered that COHEN made the following wires to JEROME in 2022:

   a.   05/18/22 — $80,000.00

Page **13** of **39**

    b.   06/17/22 — $60,000.00

    c.   07/18/22 — $80,000.00

    d.   08/19/22 — $50,000.00

    e.   09/08/22 — $30,000.00

    f.   10/07/22 — $60,000.00

    g.   11/07/22 — $20,000.00

    h.   11/18/22 — $1,250.00

97. This amount only totals $381,250, which means that there was still another approximate half million dollars that COHEN was holding, and which he presumably transferred to JEROME or JEROME's entities in 2023 and 2024.

98. None of this was ever disclosed to MAYA.

99. Additionally, MAYA has come to learn that following JEROME's understanding of MAYA's desire to divorce JEROME following his cheating on her in or about 2020, Defendant COHEN and his firm have assisted JEROME in creating numerous new entities, including the ones referenced herein, in order to steal all of the assets rightly belonging to the Plaintiffs.

100.      Defendant COHEN and his firm created these entities behind MAYA's back, never one time telling her that they were no longer representing her but solely JEROME, a clear conflict of interest.

101.      Meanwhile, they continued to communicate with MAYA as if they were still representing her as well, up until 2024 when they suddenly refused to give her any information or documentation or speak with her.

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 17 of 41

102.     On August 5, 2024, MAYA emailed COHEN'S office asking for all retainer agreements and all receipts/invoices involving her, JEROME, and their businesses—BCD, Phipps and Co, Phipps Construction, Phipps Enterprises, Moonkite Media, and anything else tied to them.

103.     The next day, COHEN's office emailed back stating that "in light of our understanding of the contentious nature of your matrimonial proceedings," they would not provide anything absent a subpoena.

104.     This was the first time MAYA's request for basic records about her own legal work was refused on the grounds that her divorce was "contentious," and the first time that Defendant COHEN and his firm even hinted that they were no longer representing MAYA.

105.     Moreover, MAYA has recently come to discover that JEROME may have been behind one or both tax debts (not only was there this more recent sales tax issue, but where was previously a sales tax issue in 2015), which previously had been blamed on another, which may explain why Defendant COHEN and his firm never resolved the most recent tax debt now threatening the Sag Harbor home.

106.     At all relevant times, JEROME employed an in-house accountant named Lasha Shalamberidze to perform accounting, payroll, banking, and tax-related functions for Phipps-controlled entities, including entities operating under the Phipps corporate umbrella.

107.     During Lasha Shalamberidze's tenure, significant sums of money became unaccounted for, including corporate funds that were diverted from Phipps-controlled entities into accounts not belonging to those entities.

Page **15** of 39

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 18 of 41

108.    As a result of those discoveries, Phipps-controlled entities commenced litigation against JPMorgan Chase Bank, alleging that Lasha Shalamberidze had conspired with an individual or individuals at Chase Bank to misappropriate corporate funds.

109.    The funds at issue belonged to Phipps entities but were deposited into accounts controlled by Lasha Shalamberidze.

110.    An investigation uncovered fraudulent checks, unauthorized use of company banking access, and the deposit of company funds into a Chase account associated with a fictitious entity, LLLTM Corp, created by Lasha Shalamberidze.

111.    In fact, following the discovery that substantial sums were missing from company accounts—including funds attributable to payroll taxes, New York sales taxes, and federal tax obligations—Defendant COHEN retained a firm, Talbert & Talbert, to conduct forensic accounting and assist with communications with taxing authorities.

112.    Talbert & Talbert determined that corporate funds had been misappropriated or diverted; however, despite the involvement of forensic accountants and tax counsel and the magnitude of the missing funds, MAYA was never provided complete accounting records explaining the missing payroll, sales tax, and federal tax monies.

113.    Moreover, for reasons that were never explained to nor understood by MAYA, no criminal investigation or criminal charges were ever pursued against Lasha.

114.    However, on January 25, 2026, MAYA discovered that LLLTM Corp is still an active corporation to this day, and that the corporation was being funded by the Phipps companies and apparently MAYA and JEROME personally, as checks from Blue

Cross Blue Shield in MAYA and JEROME's personal names were deposited into this account.

115.    This has of course raised the obvious question of whether JEROME was colluding with Lasha Shalamberidze to embezzle money and create this alleged fraud.

116.    In the aftermath of her discovery of all of this activity, MAYA has requested the business records from her and JEROME's CPA, Jacob Oberlander.

117.    Because JEROME is the only listed owner, Mr. Oberland has refused to provide business records absent a court order.

118.    MAYA has recently discovered that in 2025, Mr. Oberlander filed her and JEROME's 2023 taxes using an authorization that allegedly contains her signature and which she never signed.

119.    Additionally, since filing for divorce in November 2023, JEROME has taken a number of actions to harm MAYA, including:

   a.  Restricting access to her marital funds by transferring money from joint accounts, leaving her entirely dependent on him.

   b.  Colluding with her landlord to create a hostile living environment and file an eviction notice strategically timed to prevent her from securing a new home for herself and her children.

   c.  Using two female accomplices to engage in identity theft involving MAYA's accounts with AT&T, Blue Cross Blue Shield, Amazon, Instacart, Xfinity, Ring, ADT, and others, which has harmed MAYA and her children.

    d.   Illegally removing MAYA's access to her intellectual property, GoDaddy accounts, emails, contracts, and her life's work;

    e.   Transferring bank accounts and funds and forging MAYA's signature on various documents.

120.    Additionally, JEROME has placed the Sag Harbor property at extreme risk.

121.    Besides for attaching BCD's sales tax debt to the property, as well as his own debt to the property even though he has never lived there, JEROME has recently stopped paying the mortgage on the property, presumably in the hopes of forcing a sale or foreclosure to pay the sales tax debt.

122.    Despite JEROME's claim of poverty, the reality is that he has been stealing and hiding millions of dollars of Plaintiffs' money and hiding it in the name of others, such as his mother, Defendant MARGERY PHIPPS, or in offshore accounts.

123.    For example, MAYA has learned that JEROME has removed their company's website from the internet without her consent and replaced it with a new company in his own name Phipps International.

124.    JEROME then amassed substantial debt under Phipps International, so he took down the website and replaced it with a new company, Phipps Global, which upon information and belief he has placed under a trust called Eclipse Holding Trust and which he allegedly has his mother managing.

125.    Phipps Global LLC has been created by JEROME without MAYA's knowledge as a mirror or successor vehicle to their former companies, Phipps & Co and Phipps Enterprises dba Phipps International, all now under JEROME'S control, and

placed under the visible control of his mother while ownership is pushed into a different trust.

126.    This entity replicates the prior Phipps & Co. / Phipps International platform under a new name and continues a pattern whereby JEROME creates and restructures new and successor entities under the control of him, his attorneys, and his family, while excluding MAYA from ownership, management, banking authority, and economic participation.

127.    As another example, as recently as December 16, 2025, JEROME attended an event called "Billionaires Row: The Golden Gate", hosted by Steve Chaywoski, in Fort Lauderdale, Florida, where he publicly boasted that he was restructuring his estate.

128.    This has all led MAYA to conduct further investigation into JEROME and his assets.

129.    What MAYA has uncovered has shocked her, as she has learned just how much JEROME has lied to her over the years.

130.    First, in 2015/2016, JEROME used money from MAYA's father's inheritance to buy a hotel called Stay Bridge Suites in Myrtle Beach, South Carolina.

131.    However, he purposefully cut her out of the deal by creating new companies such as Suncroft Advisors LLC, SA SBS Myrtle Beach, and Phipps SC.

132.    This occurred even though MAYA raised more than $17 million through her contact Andrew Schupak, a private equity investor, and invested additional funds before being pushed out.

Page **19** of 39

Case 1:26-cv-01089-LAK   Document 1-1   Filed 02/09/26   Page 22 of 41

133.     JEROME then alleged to have lost the hotel, but MAYA has now learned that in fact there was extensive litigation related to the hotel, of which she was never informed.

134.     She has likewise learned that there is a currently pending litigation, Pizzarotti LLC v. Phipps Co BDC LLC SG, which is on for a court appearance in August 2026, of which she was told was resolved years ago, and of which she has been informed nothing.

135.     She has likewise learned that another case of which she was supposed to be a part, Phipps Enterprises vs. Capistrano Acres Mutually Water, a lawsuit revolving around, in part, MAYA getting sick due to mold issues in the house she and JEROME were renting, went to mediation without her knowledge or consent.

136.     Someone, presumably JEROME, has also purchased a BMW in MAYA's name.

137.     Additionally, MAYA has learned that numerous companies that Defendant COHEN was supposed to be opening for both MAYA and JEROME were only opened up solely in JEROME's name.

138.     MAYA has uncovered numerous companies JEROME opened of which she was not told and for which she has never received a K-1.

139.     Even those companies of which she was aware, which Defendant COHEN was supposed to open in her name, were apparently not.

140.     For example, Graham and Phipps was funded by MAYA and it was her employees who did the work, and yet she never received a K-1.

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 23 of 41

141.     JEROME had informed MAYA that the Graham and Phipps company was dissolved, but a forensic accountant has found an active bank account owned by the company with more than $500,000 as of November 2024.

142.     Likewise, JEROME had informed MAYA that BCD had stopped operating around 2020, yet she has discovered that in 2022, BCD still had business insurance.

143.     Moreover, MAYA has learned that the insurance documents for BCD and Phipps Enterprises listed an address of 222 West 10th Street, Suite 2B, New York, NY, even though JEROME had stated to her that they had given up that unit, once again raising the question of whether JEROME still in fact owns that unit under a different entity name.

144.     MAYA has also uncovered a number of bank accounts of which she was never informed.

145.     For example, MAYA has uncovered bank accounts showing in November 2023 JEROME moving money from their joint Phipps company account to an account listed as Phipps Enterprises at Chase Bank ending in 7203, totaling $327,000.

146.     There have been numerous other transfers into that account and others from their joint Phipps company account.

147.     There are also transactions into a company account for Swedes LLC at PNC Bank, which is registered to JEROME and Phipps Enterprises' 710 Claremore Drive address, and which has Maria T. Evans a/k/a Theresa Evans listed as the manager.

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 24 of 41

148.    There are at least five entities that JEROME appears to be running out of 710 Claremore Drive: Phipps Enterprises, LLC; Swedes LLC; Waisman Security Corp; Skinney Inc; and the Phipps Global business.

149.    All five of these businesses have been using 710 Claremore Drive, West Palm Beach, Florida 33401 as a business and mail hub, concentrating multiple corporate records and financial mail at the same residential address.

150.    Moreover, this Maria/Theresa Evans has been acting with JEROME to commit identity theft and criminal impersonation against MAYA with everything from BCBS, AT&T, VRBO, X-Finity, FPL, using and signing MAYA's name for legal and banking documents, to open and close consumer accounts, transferring ownership of my accounts to either her and/or JEROME.

151.    This is not the only person who JEROME has used to impersonate MAYA.

152.    On February 10, 2025, a Blue Cross Blue Shield representative in North Carolina informed MAYA that Defendant MARGERY PHIPPS, Jerome's mother, has been an authorized user on MAYA's account and had been actively communicating with them.

153.    Theresa Evans has likewise fraudulently interacted with Blue Cross Blue Shield at JEROME's behest in order to harm MAYA.

154.    MAYA has also uncovered that on January 23, 2025, JEROME took out a loan in Phipps Enterprises, LLC without her  knowledge, consent, or participation for $594,000 with Evolved Capital, LLC, stating that Phipps Enterprises was making more than $40,000 per week, with a total loan amount owed of $720,000.

Page **22** of **39**

155.     As another example of JEROME's using of these new companies to defraud and steal from MAYA, in or about the summer of 2021, JEROME introduced MAYA to Joseph Schottland, and stated that he was forming a new company with Mr. Schottland for the purpose of EV charging station.

156.     JEROME invested his and MAYA's money and received shares in the company EV Plus Charging, but the shares were then redirected to one of JEROME's new entities created by Defendant COHEN in order to exclude MAYA, the Phipps Family Trust, and the J and M Family Trust, even though that  was where the money came from for the investment.

157.     JEROME lied and alleged that only $40,000 went into the company, but MAYA's forensic accountant has uncovered that at least $200,000 went into the company from Phipps Enterprises.

158.     JEROME is the Chief Revenue Officer of this company and has stated that the shares are worth between $8–12 million.

159.     Because Defendant COHEN and Jacob Oberlander have refused to provide MAYA with an accounting or any books and records, MAYA has no idea what assets or liabilities have been earned/incurred by JEROME in MAYA's name or in the name of any of these other entities that JEROME secretly created using COHEN's help.

160.     MAYA does not have access to her IP, software, computers, data bases, bank accounts, investments, or tax filings.

161.     Her entire life's work since the age of 21 is now in those servers that JEROME controls.

162.     Because Defendant COHEN and his firm did not pay the sales tax debt, MAYA cannot open a bank account or else New York State will freeze and seize her money, as she has already had $35,000 seized from her aunt's account simply because MAYA appeared on the account.

163.     MAYA cannot function, start a new company, move forward with her life, or accomplish anything due to the actions of Defendants.

164.     It is believed that the total amount that has been diverted from Plaintiffs is in the tens of millions of dollars; however, Plaintiffs cannot state the precise total at this time because full bank statements, wire confirmations, accounting ledgers, and corporate books and records remain unavailable to Plaintiffs and/or are in the exclusive possession and control of the Defendants and other third parties.

165.     By way of example only, and without limitation, based on the bank account documents that MAYA has recently received,

    a.   On or about June 12, 2024, Phipps Enterprises LLC transmitted an outgoing wire in the amount of $1,000,000.00 from its Flagstar Bank account to its Webster Bank account;

    b.   On the following day, June 13, 2024, the Webster Bank account reflects a further $1,000,000.00 transfer described as "APX TXFR TO DD XXXXXXXX4343," effectively moving the same funds onward;

    c.   The Webster Bank statement further reflects an incoming wire dated June 3, 2024, in the amount of $250,000.00, referencing "Phipps Enterprises LLC" and "JPMorgan Chase" (BMG OF XXXXXX6799), indicating the

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 27 of 41

existence of additional Phipps Enterprises banking activity at JPMorgan Chase;

d.  From July 15, 2024 through July 22, 2024 there are 2 small outgoing wires, and on that same day, July 15, 2024, there is an incoming wire labeled WEB TXFR FR DD XXXXXXXX4343 $280,000.00 – used to replenish the money that was spent;

e.  On July 22, 2024 – there is an OUTGOING WIRE,EAST FAR INDUSTR IAL CO LIMITED,WELLS FARGO NY, ,2764941-$250,000.00;

f.  The money is replenished later that day. July 22, 2024 07/22/2024 WEB TXFR FR DD XXXXXXXX4343 $250,000.00;

g.  On July 26, 2024, there are multiple OUTGOING WIRE transfers totaling nearly $100,000, and then the funds are replenished again WEB TXFR FR DD XXXXXXXX4343 $112,000.00;

h.  On July 31, 2024 there is an OUTGOING WIRE,CITY OCEAN INTER NATIONAL INC,CITIBANK, N.A.,,2 XXXXX6586-$28,800.00;

i.  That same day the money spent is replenished yet again by an incoming transfer labeled WEB TXFR FR DD XXXXXXXX4343 $20,000

166.    This means that JEROME is transacting in hundreds of thousands of dollars on a monthly basis, and then replacing the funds from the same linked DD account ending 4343, repeatedly, shortly after money leaves.

167.    This suggests that the Webster Bank account is being used like a pass-through payment account—not operating off its own income, but being "topped up" from another source to cover outgoing wire

Page **25** of **39**

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 28 of 41

168.     The XXXX4343 account is the account used to replenish funds – this appears to be the funding account/ "master account," an account of which MAYA was never made aware and has no knowledge.

169.     This is yet another account that had not been disclosed to MAYA and remains outside of her access and control.

170.     This shows a pattern of movement of funds between accounts in a manner consistent with concealment and/or diversion.

171.     Additionally, Meteor Eclipse Holdings, Inc. (with Margery Phipps as President) appears to be used as a layering vehicle with Eclipse Holding Trust (with Margery Phipps as Trustee), with payments flowing through these structures.

172.     Likewise, in 2024, over $2 million dollars was transferred from Webster bank to Apex Clearing, a brokerage firm clearing house:

    a.  03/13/2024 –$1,000,000;

    b.  07/15/2024 –$250,000;

    c.  07/26/2024 –$112,000;

    d.  08/08/2024 - $70,000;

    e.  08/09/2024 -$16,000 ;

    f.  08/14/2024 - $160,000.00;

    g.  11/01/2024 -$750,000.00;

    h.  11/08/2024 -$2,950.00.

173.     This is yet another account of which MAYA was never made aware, and which JEROME has used to try to divert and hide assets away.

Page **26** of **39**

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 29 of 41

174.    Thus, discovery and an accounting will be necessary to determine the true

extent of the money that JEROME has been stealing from Plaintiffs, with the assistance

of the various other Defendants.

## AS AND FOR A FIRST CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY

## (Against Defendant JEROME PHIPPS)

175.    Plaintiff repeats and realleges each and every allegation contained in

paragraphs "1" through "174" inclusive, as if more fully set forth herein at length.

176.    As spouse, co-trustee, and business partner with MAYA, Defendant

JEROME was a fiduciary who owed MAYA full fiduciary duties.

177.    Accordingly, JEROME owed MAYA the highest duties of loyalty, fair

dealing, honesty, good faith and full disclosure.

178.    Defendant breached these duties.

179.    These breaches are enumerated above, but of the most egregious ones:

    a.    Defendant has stolen and converted millions of dollars of assets;

    b.    Defendant has allowed a multi-million-dollar tax lien to accrue against

        Plaintiff's business and property;

    c.    Defendant has diverted millions of dollars in new orders to his own

        wholly-owned companies.

180.    Defendant's actions in breach of his fiduciary duties have caused MAYA

damages in an amount to be proven at trial but believed to be in excess of ten million

dollars.

181.     Defendant's actions were deliberate, with knowledge of Plaintiff's rights, and with intent to interfere with those rights.

182.     Defendant's actions were wanton, willful, and malicious.

183.     Accordingly, punitive damages should therefore be awarded against Defendant in addition to compensatory damages, in an amount no less than three times Plaintiff's compensatory damages.

## AS AND FOR A SECOND AND THIRD CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY/ AIDING AND ABETTING
### (Against Defendants COHEN and COHEN LLP)

184.     Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "183" inclusive, as if more fully set forth herein at length.

185.     As MAYA's attorneys, Defendants COHEN and COHEN LLP were fiduciaries who owed MAYA full fiduciary duties.

186.     Accordingly, Defendants COHEN and COHEN LLP owed MAYA the highest duties of loyalty, fair dealing, honesty, good faith and full disclosure.

187.     Defendants breached these duties.

188.     These breaches are enumerated above, but of the most egregious ones:

   a.   Assisting Defendant JEROME in stealing and converted millions of dollars of assets;

   b.   Allowing a multi-million-dollar tax lien to accrue against Plaintiff's business and property when Defendants specifically received money to pay off the debt.

189.    Defendants also had an unwaivable conflict of interest that was never disclosed to MAYA.

190.    Defendants' actions in breach of their fiduciary duties have caused MAYA damages in an amount to be proven at trial but believed to be in excess of ten million dollars.

191.    At a bare minimum, Defendants knowingly participated in the breach by establishing these entities and trusts, withholding and lying to MAYA about them, and making false filings on behalf of JEROME.

192.    Defendants' actions were deliberate, with knowledge of Plaintiff's rights, and with intent to interfere with those rights.

193.    Defendants' actions were wanton, willful, and malicious.

194.    Accordingly, punitive damages should therefore be awarded against Defendants in addition to compensatory damages, in an amount no less than three times Plaintiff's compensatory damages.

## AS AND FOR A FOURTH and FIFTH CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY/AIDING AND ABETTING

### (Against Defendants WEBSTER and GREEN)

195.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "194" inclusive, as if more fully set forth herein at length.

196.    As MAYA's banker for nearly a decade, Defendant GREEN was a fiduciary who owed MAYA full fiduciary duties.

197.    Accordingly, Defendant GREEN (and Defendant WEBSTER via respondeat superior) owed MAYA the highest duties of loyalty, fair dealing, honesty, good faith and full disclosure.

198.    Defendant breached these duties.

199.    These breaches are enumerated above, but of the most egregious ones:

a.    Assisting Defendant JEROME in stealing and converted millions of dollars of assets.

200.    Defendants' actions in breach of their fiduciary duties have caused MAYA damages in an amount to be proven at trial but believed to be in excess of ten million dollars.

201.    At a bare minimum, Defendant knowingly participated in the breach by assisting JEROME in transferring and converting millions of dollars.

202.    Defendants' actions were deliberate, with knowledge of Plaintiff's rights, and with intent to interfere with those rights.

203.    Defendants' actions were wanton, willful, and malicious.

204.    Accordingly, punitive damages should therefore be awarded against Defendants in addition to compensatory damages, in an amount no less than three times Plaintiff's compensatory damages.

## AS AND FOR A SIXTH CAUSE OF ACTION: ACCOUNTING

### (Against Defendants JEROME PHIPPS)

205.    Plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "204" inclusive, as if more fully set forth herein at length.

Page **30** of 39

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 33 of 41

206.     As spouse, co-trustee, and business partner with MAYA, Defendant JEROME was a fiduciary who owed MAYA full fiduciary duties.

207.     As 50/50 partners, MAYA was entitled to 50% of all money and assets from the couple's various businesses.

208.     However, as discussed, JEROME has taken millions of dollars and transferred them into his own accounts.

209.     JEROME has also diverted all new orders for the business to his own wholly-owned entities.

210.     JEROME has done this through the creation of dozens of shell corporations.

211.     JEROME has refused to account for the assets of the partnership and MAYA's share thereof.

212.     As a spouse, co-trustee, and partner to whom JEROME owes a fiduciary duty, MAYA is entitled to a full and truthful accounting of all property and assets that have been received and transferred by JEROME.

213.     As discussed above, JEROME usurped control of the parties' assets, including its inflows and outflows.

214.     Accordingly, a burden of having to account for such inflows and outflows was placed upon JEROME, and is information to which MAYA was and is entitled.

215.     JEROME has refused to account for the inflows and outflows of the money from the various businesses.

216.     Additionally, as described above, JEROME has converted the parties' assets for his own use.

217.    MAYA has no adequate legal remedy to determine the inflows and outflows of the money and other assets from the various businesses, and thereby cannot determine the amounts due and owing to her.

218.    Accordingly, MAYA is entitled to an accounting by JEROME regarding the inflows and outflows of all property to and from all of the various entities.

## AS AND FOR A SEVENTH CAUSE OF ACTION: FRAUD

## (Against Defendants JEROME PHIPPS, COHEN, COHEN LLP,

## MARIA EVANS a/k/a THERESA EVANS)

219.    Plaintiff repeats and realleges paragraphs "1" through "218" as if fully set forth herein.

220.    Defendants knowingly made false representations of material fact, including but not limited to:

a. That Plaintiff was a 50% owner and beneficiary of Phipps Enterprises, LLC and the J & M Family Trust;

b. That certain entities had been dissolved or were inactive when they were active and funded;

c. That trust and corporate assets were being safeguarded for Plaintiff's benefit;

d. That tax liabilities had been paid or were being resolved;

e. That corporate and trust filings accurately reflected ownership, management, and addresses; and

f. That Plaintiff's signatures and authorizations had been validly obtained.

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 35 of 41

221.     At the time these representations were made, Defendants knew they were false, or made them with reckless disregard for the truth.

222.     Defendants made these misrepresentations with the intent to induce Plaintiff's reliance, including inducing Plaintiff to transfer funds, refrain from investigating, and forgo exercising control over her assets.

223.     Plaintiff justifiably relied on Defendants' representations due to the marital, fiduciary, attorney-client, and confidential relationships involved.

224.     As a direct and proximate result, Plaintiff suffered damages in an amount to be proven at trial but believed to be in excess of ten million dollars.

225.     Defendants' conduct was willful, malicious, and part of a deliberate scheme, entitling Plaintiff to punitive damages.

## AS AND FOR AN EIGHTH CAUSE OF ACTION: CONSTRUCTIVE FRAUD
### (Against Defendants JEROME PHIPPS, COHEN, and COHEN LLP)

226.     Plaintiff repeats and realleges paragraphs "1" through "225".

227.     Defendants stood in fiduciary and confidential relationships with Plaintiff.

228.     Defendants concealed material facts and made misleading statements concerning ownership, trusts, transfers, tax liabilities, and asset control.

229.     Because of the fiduciary relationships, intent to defraud need not be shown.

230.     Plaintiff relied upon Defendants' omissions and misrepresentations to her detriment.

231.     Plaintiff suffered substantial damages as a result.

Page **33** of **39**

## AS AND FOR A NINTH CAUSE OF ACTION: CONVERSION

### (Against All Defendants)

232.      Plaintiff repeats and realleges paragraphs "1" through "231".

233.      Plaintiff had ownership and possessory rights in specific, identifiable funds, including but not limited to:

- Trust income;

- Inherited funds;

- Business revenues;

- Escrowed tax funds;

- Wired and transferred monies.

234.      Defendants intentionally exercised unauthorized dominion and control over these funds.

235.      The other Defendants have assisted JEROME in this conversion, and upon information and belief are each holding identifiable funds in their own names and/or accounts on behalf of JEROME.

236.      Defendants' acts thereby deprived Plaintiff of her property.

237.      Plaintiff has suffered substantial damages believed to exceed ten million dollars as a result of Defendants' acts.

## AS AND FOR A TENTH CAUSE OF ACTION: UNJUST ENRICHMENT

### (Against All Defendants)

238.      Plaintiff repeats and realleges paragraphs "1" through "237".

239.     Defendants were each enriched by receiving Plaintiff's money, property, and/or business opportunities.

240.     Such enrichment occurred at Plaintiff's expense.

241.     It would be against equity and good conscience to permit Defendants to retain these benefits.

### AS AND FOR AN ELEVENTH CAUSE OF ACTION: AIDING AND ABETTING

#### (Against Defendants EVANS and MARGERY PHIPPS)

242.     Plaintiff repeats and realleges paragraphs "1" through "241".

243.     Defendants Evans and Margery Phipps knowingly participated in JEROME's breach of his fiduciary duties to his wife and business partner by assisting JEROME in transferring and converting millions of dollars.

244.     Defendants' actions were deliberate, with knowledge of Plaintiff's rights, and with intent to interfere with those rights.

245.     Defendants' actions were wanton, willful, and malicious.

246.     Accordingly, punitive damages should therefore be awarded against Defendants in addition to compensatory damages, in an amount no less than three times Plaintiff's compensatory damages.

### AS AND FOR A TWELFTH CAUSE OF ACTION: FRAUDULENT

#### CONVEYANCE / VOIDABLE TRANSACTIONS

##### (Against All Defendants)

247.     Plaintiff repeats and realleges paragraphs "1" through "246".

Page **35** of **39**

248.     Defendant JEROME PHIPPS, with the assistance of the other Defendants, transferred Plaintiff's assets to insiders, shell entities, trusts, and relatives without fair consideration.

249.     The transfers were made with actual intent to hinder, delay, or defraud Plaintiff, and/or while Defendant JEROME PHIPPS made himself insolvent or rendered insolvent on paper thereby.

250.     Such transfers are voidable under the New York Debtor and Creditor Law.

251.     Plaintiff seeks avoidance of the transfers, attachment, injunction, and other statutory relief.

### AS AND FOR A THIRTEENTH CAUSE OF ACTION: CONSTRUCTIVE TRUST
### (Against All Defendants)

252.     Plaintiff repeats and realleges paragraphs "1" through "251".

253.     A confidential and fiduciary relationship existed between Plaintiff and Defendant JEROME PHIPPS.

254.     Likewise, confidential and fiduciary relationships existed between Plaintiff and Defendants, COHEN, COHEN LLP, and GREEN.

255.     Plaintiff transferred money and assets, and/or allowed the transfer of money and assets, in reliance on Defendants JEROME and COHEN's promises and representations.

256.     Defendant JEROME PHIPPS, with the assistance of the other Defendants, took this money and assets and transferred it into his own name and companies, or into the name and/or possession of the other Defendants.

Page 36 of 39

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 39 of 41

257.    Defendants were thus unjustly enriched.

258.    Equity requires the imposition of a constructive trust over all assets traceable to Plaintiff's funds or rightfully owing to Plaintiff.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION: CIVIL RICO (18 U.S.C. §§ 1962(c) & (d))

### (Against All Defendants)

259.    Plaintiff repeats and realleges paragraphs "1" through "258".

260.    Defendant JEROME PHIPPS formed an enterprise within the meaning of 18 U.S.C. § 1961(4), that included various individuals, trusts, corporations, and associated entities.

261.    The enterprise affected interstate commerce, including banking, wire transfers, real estate, and multi-state entities.

262.    Defendant JEROME PHIPPS conducted and participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, including but not limited to:

- Wire fraud (18 U.S.C. § 1343);

- Mail fraud (18 U.S.C. § 1341);

- Bank fraud (18 U.S.C. § 1344);

- Identity theft and aggravated identity theft;

- Interstate transportation of stolen property.

263.    These acts occurred repeatedly from at least 2015 through the present, constitute closed- and open-ended continuity, and were related.

264.    Plaintiff was injured in her business and property by reason of Defendants' RICO violations, in an amount believed to exceed $10,000,000.

265.    The other Defendants also conspired to violate RICO in violation of 18 U.S.C. § 1962(d) by conspiring to, and in fact, helping JEROME PHIPPS to engage in his RICO activities.

266.    Accordingly, Plaintiff seeks treble damages, costs, attorneys' fees, and injunctive relief pursuant to 18 U.S.C. § 1964.


**WHEREFORE**, Plaintiff demands that a judgment be entered against Defendants in an amount to be proven at trial but believed to be no less than $10 million dollars, with an appropriate amount of damages awarded against each Defendant in accordance with the proof adduced during discovery, punitive damages in an amount no less than three times Plaintiff's compensatory damages for those causes of action where allowed, and treble damages on the civil RICO cause of action. with pre- and post-judgment interest thereon at the statutory rate; together with attorneys' fees, the costs and disbursements of the within action, and such other, further and different relief which this Court deems just and proper.


Dated:  New York, New York
        January 28, 2026

                                    /Jonathan E. Neuman/
                                    JONATHAN E. NEUMAN, ESQ.
                                    *Attorney for Plaintiff*
                                    176-25 Union Turnpike, Suite 230
                                    Fresh Meadows, New York 11366
                                    (347) 450-6710
                                    (718) 228-3689 *facsimile*
                                    jnesq@jenesqlaw.com

Case 1:26-cv-01089-LAK    Document 1-1    Filed 02/09/26    Page 41 of 41

STATE OF FLORIDA              )
                             ) ss.:        **VERIFICATION**
COUNTY OF WEST PALM BEACH     )

MAYA BEN-AVNER PHIPPS (a/k/a MAYA PHIPPS), being duly sworn, deposes and

says:

I am the Plaintiff in the above-entitled action.  I have read the foregoing Amended

Complaint and know the contents thereof; that the same is true to my knowledge, except as to the

matters therein stated to be alleged upon information and belief, and that as to those matters I

believe them to be true.



_____
MAYA BEN-AVNER PHIPPS

Sworn to before me on the
28th day of January, 2026

_____
Notary Public

TAMMY RENE JAMES
Notary Public - State of Florida
Commission # HH692725
Expires on June 26, 2029

**ATTORNEY CERTIFICATION**

I, JONATHAN E. NEUMAN, ESQ., an attorney, hereby certify that to the best of my

knowledge, information and belief, formed after an inquiry reasonable under the circumstances,

the presentation of the within papers or the contentions therein are not frivolous within the

meaning of 22 NYCRR § 130.1.1(c).

Dated:  Fresh Meadows, NY
         January 28, 2026

_____/Jonathan E. Neuman/_____
JONATHAN E. NEUMAN, ESQ.

Notarized remotely online using communication technology via Proof.